## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| MICHAEL XU and DANIEL VAZ-POCAS, individually and on behalf of all others similarly situated, | **COMPLAINT – CLASS ACTION** |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| PORSCHE CARS NORTH AMERICA, INC., a Delaware corporation, | |
| Defendant. | **JURY TRIAL DEMANDED** |

000160001

Plaintiffs Michael Xu and Daniel Vaz-Pocas, by and through their undersigned counsel, bring this action against Defendant Porsche Cars North America, Inc. ("Porsche" or "Defendant"), on their own behalf and on behalf of a other similarly situated current or former owners and/or lessees of model year 2010 through 2016 Porsche Panamera vehicles equipped with V8 gasoline engines (the "Panamera Vehicles"), and model year 2011 through 2019 Porsche Cayenne vehicles equipped with V8 gasoline engines (the "Cayenne Vehicles") (collectively, the "Defective Vehicles"). Upon personal knowledge of the facts pertaining to themselves and on information and belief as to all other matters, Plaintiffs allege as follows:

## NATURE OF THE CASE

1.     This action is brought to address a safety-related defect in the design and manufacture of the engine cooling system in the Defective Vehicles where adhesive is used to bond slip-fit coolant pipes (the "Cooling System Defect"). The engine cooling systems in the Defective Vehicles are materially the same and the Cooling System Defect exists in all Defective Vehicles, regardless of driving conditions or compliance with Defendant's recommended maintenance schedule.

2.     Automobile engines run at very high temperatures. The engine cooling system is critical to normal and safe operation of a vehicle as it allows the

engine to operate properly without overheating. During ordinary operation, the coolant pipes repeatedly heat and cool, expanding and contracting with each "heat cycle." Normal operation also exposes the engine cooling system to extreme temperatures and road and engine vibration. Over time, the epoxy adhesive used to connect the coolant pipes degrades, loosens, and eventually fails, causing the coolant pipes and connectors or unions to suddenly separate.

3.    The Cooling System Defect presents a significant safety risk. When the slip-fit connection fails, it can completely and suddenly disconnect resulting in immediate engine failure and complete loss of vehicle power at any time and without warning, including while traveling at highway speeds. Additionally, when the coolant pipe or union separates, a significant amount of coolant liquid can be dumped throughout the engine compartment, onto the tires of the vehicle, and into the roadway. This creates an exceptionally dangerous and slippery road condition, leaving the driver of the Defective Vehicle and those traveling behind at risk of losing traction and control.

4.    Repair of the Cooling System Defect can cost owners thousands of dollars because a mechanic must remove multiple engine components to access and replace the failed parts. In addition, the sudden separation of the coolant pipe and/or union causes highly pressurized coolant to spray out into the engine

00160001

compartment, causing additional damage to the engine compartment and engine components that must be replaced. With replacement of the defective coolant parts, similarly defective parts are used, resulting in the Cooling System Defect manifesting multiple times throughout the life of a Defective Vehicle.

5.      Consumers rely on automakers, such as Defendant, to promptly inform them and initiate a remedy or countermeasure when the automaker discovers a vehicle model contains a defect, especially one that is present in multiple models and model years, and that puts the safety of the drivers, their passengers, and other drivers at risk.

6.      Porsche has known for more than a decade of the Cooling System Defect. Since at least 2007, various sources have put Porsche on notice that using epoxy adhesive to secure coolant pipes and unions to the body of major engine cooling system components is a design defect, including: (1) Porsche's internal records of customer complaints; (2) dealership records; (3) records from and complaints to the National Highway Traffic Safety Administration ("NHTSA"); (4) warranty and post-warranty claims; and (5) reports and claims relating to the same Cooling System Defect in different Porsche models. Despite such knowledge, Porsche has never taken steps to inform the Class; accept financial responsibility for repairs to Defective Vehicles; or implement a Class-wide remedy

for the Cooling System Defect. Instead, Porsche has actively concealed that there is an ongoing defect by publicly claiming that the Cooling System Defect was fixed with a change in the manufacturing process, failing to admit there is a defect when questioned by customers, and continuing to advertise the Defective Vehicles as being safe and of a particular high-end quality.

7.    As a result of Porsche's unfair, deceptive, and fraudulent conduct, Plaintiffs and other Class Members received cars worth less than as represented and what Plaintiffs and Class Members paid. Plaintiffs and the other Class Members have suffered injury in fact and incurred damages. Accordingly, Plaintiffs, on their own behalf and on behalf of the following classes seek damages and equitable relief, including restitution and injunctive relief:

> For unjust enrichment, all persons who are the current or former owners, purchasers or lessees of the Defective Vehicles distributed for sale or lease in any of the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and possessions.

> For all claims, all persons who are the current or former owners, purchasers or lessees of the Defective Vehicles distributed for sale or lease in California, New Jersey and all other states with sufficiently similar applicable laws.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d), because: (a) this action is brought as a proposed class action

under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) many of the proposed Class Members are citizens of states that are diverse from Porsche's domicile; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

9.      Venue is proper in this judicial District under 28 U.S.C. § 1391(b)(1) because Defendant's headquarters and principal place of business is in this District.

## PARTIES

10.     Plaintiff Michael Xu is a resident of Los Angeles County, California. In 2011, Plaintiff Xu purchased a new 2012 Porsche Cayenne S, equipped with a V8 engine, from Circle Porsche dealership in Long Beach, California. In April 2019, with approximately 54,000 miles on the odometer, the Cayenne suddenly overheated while driving. Rusnak/Pasadena Porsche confirmed that the slip-fit connection to the coolant distributor housing and the slip-fit coolant pipe on the thermostat assembly had separated due to failure of the epoxy adhesive. Rusnak, an authorized Porsche dealership and repair facility, did not tell Plaintiff when he brought the vehicle in for repair that the problem with the engine cooling system in his Cayenne was due to the Cooling System Defect. Rusnak also did not advise Plaintiff that a safer, alternate design was available for the coolant distributor housing and the thermostat assembly; and instead replaced the failed components

00160001

with new, but equally defective parts that used the slip-fit and adhesive design. As a result, Plaintiff was forced to pay $3,834.93 to Rusnak to repair the Cayenne with defective parts. Plaintiff purchased his Porsche Cayenne S reasonably believing it was safe and of a particular quality based on Porsche's advertising of its vehicles. He lost money and property as a result of Porsche's conduct. He would not have purchased his Porsche Cayenne S had he known it contained a Cooling System Defect that could and did render the vehicle unsafe during normal use.

11.    Plaintiff Daniel Vaz-Pocas is a resident of Yonkers, New York. In January 2017, Plaintiff Vaz-Pocas purchased a used, 2012 Cayenne S with approximately 60,000 miles on the odometer from Town Motors Porsche in Englewood, New Jersey. Four months later, on Mothers' Day, Plaintiff Vaz-Pocas and his wife were traveling in his Cayenne S from his mother-in-law's home. While driving on a bridge, Plaintiff Vaz-Pocas' Cayenne S suddenly overheated and began spewing smoke from the engine. He was forced to put the car into neutral and was lucky enough to coast down the hill of the bridge until he was able to pull over. He and his wife remained stranded there until a tow truck arrived. Plaintiff Vaz-Pocas' Cayenne S was towed to Porsche Larchmont, as the closest Porsche dealer. A subsequent inspection revealed that the coolant pipe had separated from the thermostat housing after the epoxy adhesive failed. Porsche

00160001

Larchmont estimated the repair at approximately $4,000. Plaintiff then had his Cayenne S towed to Town Motors Porsche where he purchased it. They again confirmed that the coolant pipe had separated after the epoxy failed. For several weeks, Plaintiff Vaz-Pocas was without a vehicle while contesting the quoted repair costs with Porsche. Ultimately, Plaintiff Vaz-Pocas was forced to pay approximately $800 to repair his Cayenne S. Plaintiff purchased his Porsche Cayenne S reasonably believing it was safe and of a particular quality based on Porsche's advertising of its vehicles. He lost money and property as a result of Porsche's conduct. He would not have purchased his Porsche Cayenne had he known it was unsafe and contained a design and manufacturing defect that leads to the coolant pipes suddenly separating during normal use.

12.    Defendant Porsche Cars North America, Inc. is incorporated in the State of Delaware and is headquartered in Atlanta, Georgia. Porsche, as the exclusive importer and distributor of Porsche vehicles for the United States, sold, marketed, distributed, and serviced the Defective Vehicles.

## FACTUAL BACKGROUND

### Porsche's Use of Epoxy Adhesive on Slip-Fits Is a Design and Manufacturing Defect, Rendering the Defective Vehicles Unreliable and Unsafe

13.    Porsche vehicles are high-end performance vehicles. The Defective Vehicles at issue all contain upgraded performance packages and a V8 engine,

7

including the S, 4, 4S, GTS, Turbo, Turbo WLS, and Turbo S models. Purchased new, the retail price for the Defective Vehicles begins at $45,500 for the Cayenne Vehicles, and $89,900 for the Panamera Vehicles.

14.     Porsche knows purchasers of its vehicles reasonably expect a safe and quality vehicle. Through decades of long-term advertising and branding, Porsche has conveyed the message to its purchasers that Porsche vehicles are high quality and safe performance vehicles. In its advertisements, including advertisements for the Defective Vehicles, Porsche uses the tagline, "Porsche, There Is No Substitute." Porsche also represents in the owner's manuals for the Defective Vehicles that "[a] lot has gone into the manufacture of your Porsche, including advanced engineering, rigid quality control and demanding inspections."

15.     Despite their significant price tag and Porsche's representations regarding the quality and safety of the Defective Vehicles, the engine cooling systems in the Defective Vehicles were designed and manufactured using an inadequate and defective method to adjoin coolant system components that results in sudden separation, causing significant damage and rendering the vehicles unsafe.

16.     Porsche uses epoxy adhesive to attach coolant pipes and unions directly to the body of a particular component, like the thermostat housing and the

8

coolant distributor housing. This is known as "slip-fit" because an end of a pipe or union is coated with epoxy and inserted, or slipped, into another component. No other mechanism, such as a screw or clamp, is used to attach the slip-fit pipes and unions together.

17.    A diagram of the thermostat assembly in the Defective Vehicles, including the thermostat housing and coolant pipes connecting to the thermostat housing, is pictured below:



18.    The coolant pipe at issue, is the upper pipe connecting to the thermostat housing.

19.    A diagram of the coolant distributor housing in the Defective Vehicles, including the slip-fit union connecting to the housing, is pictured below:

00160001



20.    The union at issue, is the short fitting on the driver's side of the coolant distributor housing.

21.    A vehicle's cooling system is critical to keeping the vehicle operational and safe to use. When working properly, the engine cooling system keeps the vehicle from overheating while in use by sending a liquid coolant throughout the engine to pick up heat. The heated fluid then travels through tubes or hoses to the radiator where it is cooled. Once the liquid is cooled, it is recirculated throughout the engine to pick up more heat. A thermostat is placed between the engine and radiator to monitor and regulate the temperature of the

coolant liquid. A water pump ensures this cycle is continuous while the vehicle is in use.

22.     If the coolant system fails, the vehicle must be immediately turned off. If the vehicle remains in use without a working engine cooling system, the engine temperature will quickly rise and, in a matter of minutes, an overheated engine can be rendered useless.

23.     Every time the Defective Vehicles are driven, and the engines turned on and off, their engine cooling system components are heated significantly and then cooled. Over time, with repeated heating and cooling or "heat cycles," and compounded by constant road and engine vibrations while the vehicle is running, the epoxy adhesive used to adjoin coolant pipes and unions degrades, softens and loosens. Eventually but prematurely, the coolant pipes and unions detach as a result of the Cooling System Defect.

24.     When the coolant pipes and unions separate, there is a rapid loss of coolant into the engine compartment of the Defective Vehicles and the engine overheats. Soon after, the engine shuts down, rendering the vehicles immobile, unsafe to drive, and a hazard on the roadways.

00160001

25.    The thermostat assembly and the coolant distributor housing in the Defective Vehicles are materially the same because they use the same defective epoxy design to join slip-fit coolant pipes and unions to the housing body.

26.    There is no warning to drivers of the Defective Vehicle as to when the epoxy adhesive will fail. As the adhesive that bonds the coolant pipes and unions cannot be detected through a visual inspection because the epoxied portion sits inside the housing body, and the thermostat assembly and coolant distributor housing are blocked from view by the intake manifold and other engine components. There also is no reinforcement such as screws or a clamp on the pipes or the unions to prevent complete separation when the adhesive fails. The first sign of failure is often the sudden and rapid release of coolant fluid while the vehicle is in use.

27.    When either the thermostat assembly or the coolant distributor housing fails, the repairs are significant, labor intensive, and costly. After a sudden coolant dump, Porsche does not reattach or repair the separated pipe or union; the entire assembly is replaced. At a minimum, the water pump, thermostat assembly and/or coolant distributor housing must be replaced. To do this, the engine and several other components must be removed. The coolant also damages other critical components, which are often replaced. In some failures, other electrical

components and radiator(s) may be damaged. These repairs cost the owner thousands of dollars.

28.     The separation of the pipes and unions in the Defective Vehicles is unrelated to and separate from normal wear and tear.

29.     Although Porsche covers the cost of repair when a failure occurs inside the warranty period, the failures most often occur just outside the warranty period, leaving the significant cost of repair to the owners and lessees of the Defective Vehicles.

### *Porsche Knew of the Cooling System Defect Before Manufacturing the Defective Vehicles but Failed to Inform and Protect Consumers and Instead Publicly Claimed the Defect Had Been Fixed*

30.     In large part because of prior internal investigations, investigations by NHTSA's Office of Defects Investigation ("ODI"), and complaints regarding Porsche's use of epoxy on certain slip-fit attachments, Porsche has been aware for many years that epoxy adhesive is insufficient to bond certain engine cooling system components.

31.     Porsche used the same adhesive epoxy design on the engine cooling system in its 2001-2007 996 and 997 models, including the 911 Turbo, GT3, GT3RS, GT2, and GT2RS models.[1] These vehicles suffered the same fate as the

---

[1]     Internally, Porsche refers to all 911 models manufactured between 1997 and

Defective Vehicles: sudden separation of the coolant pipes from the thermostat housing body due to failure of the epoxy adhesive.

32.    On April 26, 2013, the ODI opened an investigation into complaints of sudden, high volume coolant leakage in model years 2001-2007 Porsche 911's. According to the ODI, "[t]he complaints alleged that pipe ends joined by epoxy to certain coolant system components may fail suddenly and separate, resulting in large volumes of coolant leakage."[2]

33.    In response to the ODI investigation, "Porsche identified a manufacturing quality issue with the supplier's application of adhesive to coolant pipe fittings that resulted in elevated failure rates…."[3] Porsche admitted in its filings with the ODI that it "did not conduct specific durability testing of the adhesive bonds used in the coolant pipe fittings."[4]

34.    Porsche also admitted that in 2007 – well before it designed and manufactured the Defective Vehicles – it conducted an internal investigation into

---

2004 as the "Porsche 996" models, and those manufactured between 2004 and 2012 as the "Porsche 997" models.

[2]    U.S. Department of Transportation, National Highway Traffic Safety Administration, ODI Resume, PE 13-009.

[3]    *Id.*

[4]    *Id.*

reported epoxy adhesive failures on coolant pipe fittings located at the "water neck" of the water pump housing in its 911 vehicles.

35.    However, in connection with the ODI investigation, Porsche incorrectly told consumers that the Cooling System Defect was fixed. Porsche claimed that it "identified the cause as inadequate application of the adhesive," and represented to the ODI and the public, that in late January 2008, Porsche's supplier "introduced an automated metering device for application of adhesive on pipe adapters" that fixed the problem.[5] Given the continued failures, these changes did not fix the problem.

36.    Porsche also represented to the ODI that even though there had been a problem, it did not pose a safety risk in the 911 models. Contrary to the Defective Vehicles, where the engine is in the front, the engine cooling system in the 991 vehicles, is located in the rear of the vehicle and so leaked coolant fluid release out of the back of the vehicle and does not coat the tires. Additionally, according to Porsche, "the rate of leakage from a disconnected water neck pipe [was] limited by a plastic clamp which limits the displacement of the pipe to a few millimeters."[6]

---

[5]    *Id.*

[6]    *Id.*

15

As a result, "[i]n Porsche's assessment, [] the coolant would immediately expand and evaporate…."[7]

37.    The ODI noted that in Porsche's assessment, because of the location of the engine cooling system in the rear of the Porsche 911 vehicles and the minimal coolant that could leak from the water neck pipe due to the plastic clamp, "Porsche does not believe that this is likely to result in a loss of traction or control to the incident vehicle or following traffic."[8]

38.    As a result, the ODI did not identify a safety-related defect in the Porsche 911 vehicles. However, in closing its investigation on March 10, 2014, the ODI stated that although "[a] safety-related defect had not been identified at this time, [t]he closing of this investigation does not constitute a finding by NHTSA that a safety-related defect does not exist."[9]

39.    Despite Porsche's public representations in the ODI investigation that Porsche had fixed the Cooling System Defect in the Porsche 911 vehicles by implementing an automated process for applying the epoxy adhesive to the coolant pipes, the epoxy adhesive on certain slip-fit attachments in the Defective Vehicles'

---

[7]    *Id.*

[8]    *Id.*

[9]    *Id.*

engine cooling system continues to fail. Porsche has never acknowledged that the Cooling System Defect in fact still exists.

40.    Additionally, unlike the Porsche 911 vehicles, the engine and the engine cooling system in the Defective Vehicles is located in the front of the vehicle. As such, the engine cooling system in the Defective Vehicles is exposed to different rates of road and internal component vibration than the Porsche 911 models and the coolant pipes and unions in the Defective Vehicles are not reinforced with a plastic clamp at their connection to the housing body. This makes the Cooling System Defect in the Defective Vehicles an obvious safety issue. When the coolant pipe or union disconnects from the housing body while the Defective Vehicles are in use, it separates completely, dumping a significant amount of coolant liquid through the engine compartment and onto the tires of the vehicles and the roadway. This results in a significant safety risk for the driver of a Defective Vehicle and those traveling behind.

41.    Since the ODI investigation, purchasers, including Plaintiffs, have continued to report the dangerous Cooling System Defect in the Defective Vehicles, indicating that Porsche's claimed fix of the problem in January 2008 was not in fact a fix. For example, the following complaints were found on various online forums:

00160001

- December 8, 2016: An owner of a model year 2013 Porsche Cayenne S stated: "While my wife was driving on a highway the coolant hose completely separated from the housing causing the car to rapidly overheat without warning. Excessive smoke forced my wife to pull over and to exit the vehicle with 2 small children in an unsafe area of the highway. A Porsche service facility diagnosed the vehicle and replaced the component at a cost of $5,343.56. The vehicle was 4.5 years old at the time of the repair."[10]

- July 1, 2013: "I just had the same failure…The coolant tube that connects the thermostat housiing [sic] to the upper radiator hose just popped out from the thermostat housing and dropped about 2 qts of coolant. The tube is fastened with epoxy that apparently can fail after repeated heat/cool cycles. The epoxy applicable was visibly insufficient with uneven coverage."[11]

- 2017: "We have the V8 Cayenne S from 2012, about 40k miles….When something breaks it is not trivial. Recently our 2012 Cayenne experienced a COOLANT LEAK due to the ENDEMIC PORSCHE COOLANT PIPE ATTACHMENT DESIGN…Our Cayenne cooling tube connecting the 2 halves of the engine came loose, and all the coolant escaped the car in less than 30 seconds. Luckily we were on surface streets, and after flat-bedding the SUV 30 miles to the nearest dealer, the cost to repair was $5,500."[12]

- July 20, 2013: "Was picking up my parents from the airport in my 20k miles Panamera 4s and the red engine warning overheat started to flash. Then, coolant gauge defective flashed yellow. Then, overheat. Back and forth - temp meter pegged to red overheat, then off, then pegged to red. Seemed to lose power but was still going, hard to know if a sensor problem or overheat. Being on the freeway

---

[10]     http://www.carproblemzoo.com/porsche/cayenne/coolant-leaking-problems.php (last visited June 12, 2019).

[11]     https://www.6speedonline.com/forums/panamera/274908-2011-panamera-turbo-nightmare-anyone-else-having-issues-model-2.html (last visited June 12, 2019).

[12]     https://www.cargurus.com/Cars/Discussion-t9673_ds705764 (last visited June 12, 2019).

00160001

in bumper to bumper had to drive at least a bit to find a safe spot with a shoulder. Was towed to the dealer via 1800Porsche and they mentioned some two part tube connecting A to B that was changed to a single piece that can no longer blow. Mine blew up."[13]

- July 20, 2013: "I had the same issue with my 2011 Panamera S... The hose/tube connection blew out of the engine block. Its [sic] a metal tube connecting coolant hose to engine block.. [sic] The epoxy or sealant fails and the tube blows out.. [sic] Got the warning lights and bells and whistles about stopping engine and I pulled over and parked.. [sic] Porsche arranged flatbed to get car to dealer. They told me that this is not an uncommon issue[.]"[14]

- May 6, 2015: "HELP! 2010 Panamera S Coolant blew out engine Temperature high! NEED ADVICE! Hi everyone, I need some serious help... I was driving my 2010 Panamera S V8 around 4-6000RPM for about 5-10 mins and I saw the engine temp went pass the middle line. Soon later I smelled coolant from the inside. Following messages were immediately displayed: "check coolant Level", "Engine Temperature high", "Temperature sensor failed (something like that)" I then shut down the engine after 1 minute or 2. I opened up the hood and see coolant everywhere in the engine bay, it was even shot out of the hood."[15]

- July 1, 2013: "[T]he coolant on mine did leak out recently, as it has for the original posterior [sic] and a couple of other guys, causing a high engine temperature warning. The thermostat housing appears to be the weakness here. This happened after 45k miles.[16]

---

[13]    https://www.6speedonline.com/forums/panamera/313204-coolant-overheat-blow-out.html (last visited June 12, 2019).

[14]    *Id.*

[15]    https://www.6speedonline.com/forums/panamera/364043-help-2010-panamera-s-coolant-blew-out-engine-temperature-high-need-advice.html    (last visited June 12, 2019).

[16]    https://www.6speedonline.com/forums/panamera/274908-2011-panamera-turbo-nightmare-anyone-else-having-issues-model-3.html (last visited June 12, 2019).

00160001

- February 1, 2018: "My 2011 S with 83k miles on it had a failure of the glue (Loctite 638/648) that holds an aluminum coolant pipe into the thermostat housing on the front of the engine...BTW, Porsche has a 'fix' for this issue that uses threads instead of glue. Go figure. The cost is $1,800 to have a dealer implement the fix."[17]

- February 2, 2018: "New owner of a 2013 Cayenne GTS. . . Got a call that the 'thermostat pipe' could be moved by hand and should be replaced NOW. Service advisor thought it was around $2800 to do."[18]

42.    In addition to the numerous complaints online, Porsche has continued to conduct expensive repairs of the Cooling System Defect through its authorized repair facilities, including of Plaintiffs' vehicles. As discussed below, Porsche also developed an alternate design that does not use adhesives. As a result, Porsche knows or should know the Cooling System Defect still exists and should have informed Plaintiffs and Class Members of the whole truth.

### Despite Knowing that the Cooling System Defect Persists, Porsche Refuses to Inform Drivers of the Defect or Recall the Defective Vehicles to Implement Necessary Repairs

43.    Despite knowledge of the Cooling System Defect and its development of new, more reliable design of the thermostat assembly and the coolant distributor housing, Porsche refuses to admit there is an ongoing problem with the Defective Vehicles, refuses to notify purchasers of the Defective Vehicles that use of

---

[17]    https://rennlist.com/forums/cayenne-958-2011-2018/1045931-2011-2014-v8-serious-issue-coolant-pipe-glue.html (last visited June 12, 2019).

[18]    *Id.*

adhesive on certain slip-fit attachments is prone to sudden failure, refuses to correct its public statements that the problem was fixed, and refuses to recall the Defective Vehicles to conduct repairs and replacements.

44.    Every new and used Porsche vehicle purportedly undergoes a thorough inspection before it is sold or leased. The results of the inspection are made available to each buyer and lessee. Porsche could have but did not inform Plaintiffs and other Class Members that the adhesive slip-fit design is prone to early failure and that there is an ongoing defect. Instead, Porsche claims the Cooling System Defect was fixed with a manufacturing change and claims ignorance of an ongoing problem, leaving Plaintiffs and other Class Members to pay thousands of dollars in repair and other related costs.

45.    There are alternate, safer designs for attaching coolant pipes to the thermostat housing, including the ones Porsche has used in certain Panamera and Cayenne Vehicles. In one alternate Porsche design, the coolant pipes have a mounting flange that bolts onto the thermostat housing, as illustrated in the diagram below:

00160001



46.    In another alternate Porsche design, the union is threaded directly into the coolant distributor housing, as illustrated in the diagram below:



22

47.    Porsche has not informed drivers of these safer alternative designs and refuses to implement them in the Defective Vehicles for free. Instead, Porsche requires owners of the Defective Vehicles to pay thousands of dollars in repairs and continues to represent that its vehicles are safe and of a particular high-end quality.

48.    Porsche is aware that safety and reliability are of primary importance to purchasers of its vehicles, and thus engaged in a long-term, consistent advertising and branding campaign representing that the Defective Vehicles are safe performance vehicles and are of a high-end quality.

49.    Porsche represents in the Defective Vehicles' owner's manuals that the Defective Vehicles were manufactured with "advanced engineering, rigid quality control and demanding inspections." Porsche also makes express representations about safety in its advertising. For example, on its website for 2018 Cayennes, Porsche states, "Arrive at your destination more safely, comfortably & efficiently."

50.    Porsche's advertising brochures for the Defective Vehicles also highlight the safety and quality features. Porsche's brochure for Plaintiffs' Cayenne S addressed the engine cooling system specifically: "Keeping cool is essential to any engine. A high-performance engine can only maintain its

00160001

maximum capability over a long service life if all components are operating consistently within a specific temperature range. The engines in the new Cayenne models are therefore designed for optimal cooling." Porsche further represented that in the 2012 model year Cayenne S, "[t]he entire cooling system is designed for prolonged heavy-duty use, such as off-road driving or heavy towing applications." The advertising brochure for Plaintiffs' Cayenne S also highlighted how safe the vehicle is.

51.    Brochures for other models make similar representations. For example, in Porsche's brochure for the 2013 Panamera, Porsche represents: "Performance, safety and the environment are a balance – one that Porsche engineering tackled to create a level of environmental responsibility and regard for driving safety that reflects a more balanced view of one's place in the world." In Porsche's brochure for the 2014 Cayenne Porsche states: "Another of our principles: high performance should never come at the expense of comfort or safety, and this is something we have kept to."

52.    Based on Porsche's long-term advertising and branding of its vehicles, Plaintiffs and other Class Members purchased the Defective Vehicles reasonably believing they were receiving vehicles that were safe and of a particular high-end quality. However, contrary to Porsche's affirmative promises and reasonable

24

00160001

consumer expectations, the use of adhesive epoxy on certain slip-fit attachments in the Defective Vehicles' engine cooling system is a design and manufacturing defect, rendering the Defective Vehicles unreliable and unsafe.

### *Tolling*

53.    Throughout the time period relevant to this action, Porsche willfully concealed from and failed to disclose to Plaintiffs and to other Class Members that the Cooling System Defect in the Defective Vehicles is an ongoing problem that has not been fixed. Porsche kept Plaintiffs and other Class Members ignorant of material information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the Cooling System Defect even upon reasonable exercise of diligence.

54.    Porsche knew the cooling system it designed and installed in the Defective Vehicles was in fact defective. In the report issued by the ODI in 2014, Porsche admitted that as early as 2007 it investigated the same defect in Porsche 911s and identified "the cause as inadequate application of the adhesive." However, through the ODI, Porsche publicly claimed the problem was fixed in January 2008 with the introduction of "an automated metering device for application of adhesive on pipe adapters."

00160001

55.     Porsche knew or should have known that the problem was not fixed through its continued repairs and complaints from purchasers that the adhesive continued to fail in the Defective Vehicles' engine cooling systems. Porsche did not disclose this material information to Plaintiffs and other Class Members. When Plaintiffs and other Class Members purchased or leased their Defective Vehicles, they were not informed, contrary to Porsche's prior representations, there was a defect with the engine cooling system. Additionally, when Plaintiffs and other Class Members brought their Defective Vehicles to authorized Porsche dealers for repairs caused by the Cooling System Defect, Porsche did not inform them that this was in fact the result of a defect. Instead, Porsche treated the engine overheating and engine cooling system component failure as warranty issues and made Plaintiffs and other Class Members pay for the necessary repairs.

56.     Additionally, Porsche actively concealed the existence of the ongoing Cooling System Defect from Plaintiffs and other Class Members when directly questioned whether there was a defect in the Defective Vehicles. For example, in April 2019, Plaintiff Xu called Porsche to inform Defendant about the Cooling System Defect and spoke to a representative who refused Plaintiff's request for a good will repair and directed Plaintiff to contact his Porsche dealership. When Plaintiff contacted Rusnak/Pasadena Porsche, the Service Manager told Plaintiff

there was nothing he could do, and that Plaintiff had to pay for the necessary repairs himself. Despite Porsche's knowledge there is in fact a Cooling System Defect, Porsche failed to inform Plaintiff of that material fact and that there are alternate designs available for the failed components. Consequently, Plaintiff was forced to pay $3,834.93 to replace the failed thermostat assembly and coolant distributor housing with defective slip-fit parts instead of parts utilizing the safer alternate bolted and threaded designs.

57.   Porsche also continues to affirmatively represent in advertising materials, contrary to its own knowledge, that the Defective Vehicles were safe and of a certain quality when in fact Porsche knows the Defective Vehicles suffer from the Cooling System Defect.

58.   Porsche intended that Plaintiffs and other Class Members would rely on its omissions and misrepresentations regarding the Defective Vehicles. Plaintiffs and other Class Members did in fact justifiably rely on Porsche to disclose the known Cooling System Defect. Without disclosure, Plaintiffs and other Class Members could not know there was a defect and that they had a legal claim to pursue. Instead, because they did not know of the Cooling System Defect, Plaintiffs and other Class Members purchased and leased Defective Vehicles and

paid for expensive repairs caused by the Cooling System Defect. Thus, the running of all applicable statutes of limitations has been suspended.

## CLASS ACTION ALLEGATIONS

59.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed Class defined as:

> All persons who are the current or former owners, purchasers or lessees of the Defective Vehicles distributed for sale or lease in any of the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and possessions.

60.    Plaintiffs also bring this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed multi-state Class or single state Classes defined as:

> All persons who are the current or former owners, purchasers or lessees of the Defective Vehicles distributed for sale or lease in California, New Jersey and all other states with sufficiently similar applicable laws.

61.    Excluded from the Class are: (a) Porsche, its officers, directors and employees; its affiliates and affiliates' officers, directors and employees; its distributors and distributors' officers, directors and employees; and Porsche Dealers and Porsche Dealers' officers and directors; (b) Plaintiff's Counsel; (c) judicial officers and their immediate family members and associated court staff

00160001

assigned to this case; and (d) persons or entities who or which timely and properly excluded themselves from the Class.

62.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

63.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The Class consists of tens of thousands of people. Therefore, the Class is so numerous that joinder of all members would be impracticable. The sheer number of Class Members makes joinder of all members impracticable.

64.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class Members, including:

      a.    whether the Defective Vehicles are defective;

      b.    whether Porsche misrepresented the standard, quality, and characteristics of the Defective Vehicles;

c.      whether Porsche's misrepresentations regarding the standard, quality and characteristics of the Defective Vehicles were likely to mislead reasonable consumers;

d.      whether Porsche's omission that it did not sufficiently attach certain engine cooling system components was a material fact that a reasonable consumer would be expected to rely on when deciding whether to purchase a vehicle;

e.      whether Plaintiff and other Class Members have been damaged and, if so, the extent of such damages;

f.      whether Porsche was unjustly enriched through selling and leasing the Defective Vehicles by misrepresenting the standard, quality, and characteristics of the Defective Vehicles; and

g.      whether Plaintiff and other Class Members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

65.     Porsche engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by

comparison, in both quality and quantity, to the numerous common questions that dominate this action.

66. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of other Class Members because, among other things, Plaintiffs and the other Class Members were injured through the substantially uniform misconduct described above. Plaintiffs are advancing the same claims and legal theories on their own behalf and on the behalf of other Class Members, and no defense is available to Porsche that is unique to Plaintiffs.

67. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of other Class Members. Additionally, Plaintiffs have retained counsel competent and experienced in complex class action litigation. Thus, the Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

68. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and other

31

Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Porsche, making it impracticable for the Class Members to individually seek redress for Porsche's wrongful conduct. Even if the Class Members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

### Breach of Implied Warranty of Merchantability
(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively Multistate Class or Single State Classes)

69.     Plaintiffs repeat, reallege and incorporate by reference the preceding paragraphs in their entirety as if fully set forth herein.

70.     Porsche was at all relevant times the manufacturer, distributor, warrantor, and/or seller of Defective Vehicles. Porsche knew or had reason to know of the specific use for which Defective Vehicles were purchased or leased.

32

71.    Plaintiffs and other Class Members purchased Defective Vehicles manufactured and sold by Porsche in consumer transactions. Plaintiffs and other Class Members used their Defective Vehicles in the normal and ordinary manner for which Defective Vehicles were designed and advertised.

72.    Porsche impliedly warranted that Defective Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that Defective Vehicles and their engine cooling systems were manufactured, supplied, distributed, and/or sold by Porsche would provide safe and reliable transportation; and (ii) a warranty that Defective Vehicles and their engine cooling systems would be fit for their intended use.

73.    Plaintiffs and other Class Members were the intended third-party beneficiaries of Porsche's implied warranties as they were the intended consumers of the Defective Vehicles. The dealers that sold the Defective Vehicles were not intended to be the ultimate consumers and have no rights under the warranty agreements provided with the Defective Vehicles. Defendant's warranties were intended only for the benefit of Plaintiffs and other Class Members as the ultimate consumers.

74.    Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars are

used. Defective Vehicles left Porsche's possession and control with the Cooling System Defect that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety.

75.    Through Porsche's internal records of customer complaints, dealership records, NHTSA records and complaints, and warranty and post-warranty claims, Porsche knew of the Cooling System Defect in the Defective Vehicles. Accordingly, Porsche knew before the time of sale and lease to Plaintiffs and other Class Members, or earlier, that Defective Vehicles were produced with defective engine cooling systems that were unfit for ordinary use and rendered Defective Vehicles unfit for their ordinary purposes.

76.    Despite Plaintiffs' and other Class Members' normal, ordinary, and intended uses, maintenance, and upkeep, the engine cooling system in the Defective Vehicles experienced and continues to experience the Cooling System Defect and premature failure.

77.    The alleged Cooling System Defect is inherent and was present in each Defective Vehicle at the time of sale. Plaintiffs' and other Class Members' Defective Vehicles are not of fair or average quality. Nor would they pass without objection.

00160001

78.     Porsche's unlawful conduct, as described above, was the foreseeable and actual cause of Plaintiffs and other Class Members suffering actual damage on account of receiving a vehicle that contained the Cooling System Defect.

79.     Plaintiffs and other Class Members paid for a vehicle that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, unfit for its ordinary use and not merchantable, Plaintiffs and other Class Members were damaged on account of receiving a vehicle worth less than as represented. Plaintiffs and other Class Members suffered diminution in the value of Defective Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

80.     All conditions precedent have occurred or been performed.

## COUNT II

**Breach of Implied and Written Warranties in Violation of Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.***
(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively Multistate Class or Single State Classes)

81.     Plaintiffs repeat, reallege and incorporate by reference the preceding paragraphs in their entirety as if fully set forth herein.

00160001

82.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"). 15 U.S.C. § 2301(3).

83.    Porsche is a "supplier" and "warrantor" within the meaning of the MMWA. 15 U.S.C. § 2301(4)-(5).

84.    Defective Vehicles are "consumer products" within the meaning of the MMWA. 15 U.S.C. § 2301(1).

85.    15 U.S.C. section 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty or implied warranty.

86.    Porsche warranted impliedly that the Defective Vehicles are fit for ordinary use.

87.    Porsche breached the warranties as described herein because the engine cooling systems in Plaintiffs' and other Class Members' Defective Vehicles contained the Cooling System Defect that caused certain coolant pipes and unions to separate from their housings while the Defective Vehicles were in operation, and resulted in rapid coolant loss, engine overheating, and premature failure. As such, Plaintiffs' and other Class Members' Defective Vehicles do not function as promised.

88.    The defective engine cooling systems render the Defective Vehicles unfit for ordinary use. The Defective Vehicles are equipped with thermostats and coolant distributors that are prone to sudden structural failure due to the Cooling System Defect. This makes the Defective Vehicles unfit and unreasonably dangerous for ordinary use.

89.    Porsche had actual notice of its breach of warranty. Porsche knew before the time of sale to Plaintiffs and other Class Members, or earlier, that Defective Vehicles were produced with the Cooling System Defect that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with the Defective Vehicles. Through Porsche's internal records of customer complaints, dealership records, NHTSA records and complaints, and warranty and post-warranty claims, Porsche learned of the Cooling System Defect in the Defective Vehicles.

90.    Porsche's warranty disclaimers, exclusions and limitations, to the extent they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Porsche knew when it first made these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would notice or observe the defect. Porsche also failed to take necessary actions to

adequately disclose or cure the Cooling System Defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Porsche any more time to cure the defect or cure its breaches of warranty.

91.    As alleged herein, Porsche fraudulently concealed the Cooling System Defect and the cause of action from Plaintiffs' knowledge through affirmative acts done with intent to deceive. Porsche developed an alternate and safer design for the engine cooling system components that failed due to the Cooling System Defect, yet failed to implement the redesigned parts into the repair program at its authorized dealers and continued to use unsafe, slip-fit components to purportedly repair the Defective Vehicles.

92.    Porsche's unlawful conduct, as described above, was the foreseeable and actual cause of Plaintiffs and other Class Members suffering actual damage on account of receiving a vehicle that lacked the performance that Porsche represented the Defective Vehicles to have and contained the Cooling System Defect.

93.    Plaintiffs and other Class Members paid for a vehicle that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, was unfit for its ordinary use and was not

00160001

merchantable, and which fell below the standards set by and described in Porsche's representations, Plaintiffs and other Class Members were damaged on account of receiving a vehicle worth less than as represented. Plaintiffs and other Class Members suffered diminution in the value of Defective Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT III

### Violations of California's Consumers Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*
(On Behalf of Plaintiff Xu and the Nationwide Class, or Alternatively Multistate Class or California Class)

94.     Plaintiff Xu repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

95.     Porsche is a "person," under California Civil Code section 1761(c).

96.     Plaintiff Xu and other Class Members are "consumers," as defined by Civil Code section 1761(d), who purchased or leased a Defective Vehicle.

97.     Porsche's conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of the Defective Vehicles and the engine cooling systems therein, violates the California Consumers Legal Remedies Act ("CLRA"), Civil Code section 1750, *et seq*. Specifically, Porsche violated the

00160001

CLRA by omitting material facts and failing to disclose a known Cooling System Defect in the Defective Vehicles, and by engaging in the following practices proscribed by Civil Code section 1770(a) in transactions that were intended to result in, and did result in, the sale of the Defective Vehicles:

a. representing that the Defective Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

b. representing that the Defective Vehicles are of a particular standard, quality, or grade if they are of another;

c. advertising the Defective Vehicles with intent not to sell them as advertised; and

d. representing that the Defective Vehicles have been supplied in accordance with previous representations when they have not.

98. Porsche violated the CLRA by selling Defective Vehicles that it knew were plagued by the Cooling System Defect that rendered them incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in advertisements and promotional materials, and which resulted in sudden engine failure and complete loss of vehicle power at any time and without warning, including while traveling at highway speeds. Porsche omitted

00160001

from Plaintiff Xu and other Class Members the material fact that Defective Vehicles were sold with defective engine cooling systems where adhesive on coolant pipes and unions failed, causing a complete separation of engine cooling system components, and dumping a significant amount of coolant liquid throughout the engine compartment, onto the tires of the vehicles, and into the roadway. Porsche omitted the fact that the Cooling System Defect posed a serious risk to the safety of drivers, passengers, and the public. These are facts that a reasonable consumer would consider important and material in selecting a vehicle to purchase or lease.

99.     Porsche knew before the time of sale to Plaintiff Xu and other Class Members, and earlier, that Defective Vehicles were produced with the Cooling System Defect that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with the Defective Vehicles. Through Porsche's internal records of customer complaints, dealership records, NHTSA records and complaints, and warranty and post-warranty claims, Porsche learned of the Cooling System Defect in the Defective Vehicles.

100.   Pursuant to CLRA section 1782(d), Plaintiff Xu, individually and on behalf of other Class Members, seeks a Court order enjoining the above-described

wrongful acts and practices of Porsche, ordering Porsche to extend repair and replacement remedies to all Class Members.

101. Porsche's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff Xu and other Class Members suffering actual damage on account of receiving a vehicle that lacked the performance that Porsche represented the vehicles to have and contained a Cooling System Defect.

102. Plaintiff Xu and other Class Members paid for a vehicle that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, was unfit for its ordinary use and was not merchantable, and which fell below the standards set by and described in Porsche's representations, Plaintiff Xu and other Class Members were damaged on account of receiving a vehicle worth less than as represented. Plaintiff Xu and other Class Members suffered diminution in the value of Defective Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

103. Pursuant to CLRA section 1782, Plaintiff Xu notified Porsche in writing by certified mail of the particular violations of CLRA section 1770 and demanded that Porsche rectify the problems associated with the actions detailed

above and give notice to all affected consumers of Porsche's intent to so act. A copy of this letter is attached as Exhibit A.

104.   Porsche's conduct is fraudulent, wanton, and malicious.

105.   Pursuant to CLRA section 1780(d), attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

## COUNT IV

### Violations of California's Unfair Competition Law
### California Civil Code §§ 17200, *et seq.*
(On Behalf of Plaintiff Xu and the Nationwide Class, or Alternatively Multistate Class or California Class)

106.   Plaintiff Xu repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

107.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Bus. Prof. Code § 17200.

108.   In the course of conducting business, Porsche committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, and by violating California Civil Code sections 1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and (16), the UCL, California Business & Professions Code section 17500, *et seq.*, and the common law.

109.   In the course of conducting business, Defendant committed "unfair" business practices by, among other things, misrepresenting and omitting material facts regarding the characteristics, capabilities, and benefits of Defective Vehicles. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiff Xu and other Class Members were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is "unfair" as it has offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

110.   Plaintiff Xu alleges violations of consumer protection, unfair competition, and truth in advertising laws in California, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of the UCL. There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

111.   The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business

act[s] or practices" by among other things, prominently making the representations (which also constitute advertising within the meaning of UCL) and omissions of material facts regarding the safety, characteristics, and production quality of the Defective Vehicles, as alleged herein.

112.   Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Defective Vehicle or pay a lesser price. Had Plaintiff Xu and other Class Members known Porsche used a defective slip-fit design in certain components of the Defective Vehicles' engine cooling system that were prone to early failure, they would not have purchased or leased the Defective Vehicles, or would have paid less for them.

113.   Defendant knew when the Defective Vehicles were first sold and leased that they were equipped with defective engine cooling system components that substantially diminished the quality, performance, safety and lifespan of the Defective Vehicles. Through Porsche's internal records of customer complaints, dealership records, NHTSA records and complaints, and warranty and post-warranty claims, Porsche learned of the Cooling System Defect in the Defective Vehicles. Defendant's knowledge is evidenced by Porsche's development of the

45

safer alternate designs for the thermostat assembly and the coolant distributor housing. Further, as described above, Porsche knew of the Cooling System Defect in Defective Vehicles through use of the same slip-fit and adhesive design in the 2001 through 2007 model year Porsche 911s that experienced the same problems and defects.

114.    Plaintiff Xu and other Class Members were injured and incurred actual damages as a result of Porsche's conduct in that they relied on Porsche's representations and as a result: purchased or leased the Defective Vehicles that used an unsafe and malfunctioning means of adjoining critical engine cooling system components; overpaid for the Defective Vehicles and did not receive the benefit of their bargain; paid out of pocket to repair the defect, which was known to Porsche; suffered an untimely and accelerated diminution in value of the Defective Vehicles; and suffered other injuries proximately caused by Porsche's misconduct as alleged herein. These injuries are the direct and proximate consequence of Porsche's misconduct and violation of the UCL.

115.    Pursuant to Business & Professions Code sections 17203 and 17205, Plaintiff seeks an injunction prohibiting Defendant from continuing such practices, corrective advertising, restitution, and all other relief this Court deems appropriate.

## COUNT V

### Violation of the New Jersey Consumer Fraud Act
### N.J. Stat. Ann. §§ 56:8-1, *et seq.*
(On Behalf of Plaintiff Vaz-Pocas and the Nationwide Class, or Alternatively
Multistate Class or New Jersey Class)

116.    Plaintiff Vaz-Pocas repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

117.    The purpose of the New Jersey Consumer Fraud Act ("NJCFA") is to make any act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. N.J. Stat. § 56:8-2.

118.    It is also unlawful pursuant to the NJCFA to advertise merchandise as part of a plan or scheme not to sell or lease the item so advertised. N.J. Stat. § 56:8-2.2.

119.    Defendant and Plaintiff Vaz-Pocas are a "Person" under the NJCFA. N.J. Stat. § 56:8-1(d).

00160001

120.   Plaintiff Vaz-Pocas and Class Members are consumers who purchased and/or leased Defective Vehicles for personal, family or household use.

121.   Defendant Porsche's sale, lease, and offer for sale or for lease of the Defective Vehicles constitute an "advertisement" and a "sale" under the NJCFA. N.J. Stat. §§ 56:8-1(a) and (c) (2018).

122.   Porsche has violated the NJCFA by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from consumers the existence of the defective thermostat assemblies (and the costs and diminished value of the Defective Vehicles as a result of Porsche's conduct). Accordingly, Porsche engaged in unfair or deceptive acts or practices as contemplated by the NJCFA, including:

    a. disseminating, or causing to be disseminated, false advertisements for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase or lease of the Defective Vehicles by:

        v)    representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have;

        vi)    representing that the Defective Vehicles are of a particular standard and quality when they are not;

vii)  advertising the Defective Vehicles with the intent not to sell or lease them as advertised; and

viii)  otherwise engaging in conduct likely to deceive.

123.  The facts concealed or not disclosed by Porsche to Plaintiff Vaz-Pocas and the other Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Defective Vehicle or pay a lesser price. Had Plaintiff Vaz-Pocas and the other Class Members known about the defective thermostat assemblies, they would not have purchased or leased the Defective Vehicles, or would have paid less for them.

124.  Defendant intended to Plaintiff Vaz-Pocas and the Class Members rely on their misrepresentations and/or acts of concealment and omission so that they would purchase and/or lease the Defective Vehicles.

125.  Defendant's actions as set forth above occurred in the conduct of trade or commerce.

126.  Defendant's conduct caused Plaintiff Vaz-Pocas and Class Members to suffer an ascertainable loss. In addition to direct monetary losses for repairs, Plaintiff Vaz-Pocas and Class Members suffered an ascertainable loss in that they received less than what was promised at the time they purchased and/or leased the Defective Vehicles. Plaintiff and Class Members are entitled to recover such

49

damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

127.    Pursuant to New Jersey Statutes, section 56:8-2.11, Plaintiff Vaz-Pocas, on behalf of himself and the other Class Members, seeks an order for damages, restitution and disgorgement. Plaintiff and Class Members also are entitled to treble damages pursuant to N.J. Stat. § 56:8-19.

128.    Unless Defendant is enjoined from continuing to engage in the unlawful practices alleged above, Plaintiff Vaz-Pocas and the Class will continue to be injured by Defendant's wrongful conduct. Plaintiff Vaz-Pocas seeks an injunction prohibiting Defendant from continuing such practices and corrective advertising.

129.    Pursuant to N.J. Stat. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint.

## COUNT VI

### Unjust Enrichment
(On Behalf of Plaintiffs the Nationwide Class, or Alternatively Multistate Class or Single State Classes)

130.    Plaintiffs repeat, reallege and incorporate by reference the preceding paragraphs in their entirety as if fully set forth herein.

00160001

131.  As a direct and proximate result of its failure to disclose the known Cooling System Defect, Porsche has profited through the sale and lease of the Defective Vehicles. Although these vehicles are purchased through Porsche's agents, the money from the vehicle sales flows directly back to Porsche, on which it confers an unjust, substantial benefit.

132.  As a direct and proximate result of its failure to disclose the known Cooling System Defect in the Defective Vehicles, Porsche also profited, at Plaintiffs' and the other Class Members' expense, from repeated and necessary high-cost repairs that similarly confer an unjust, substantial benefit on Porsche through part sales and proprietary diagnostic tools.

133.  Porsche has been unjustly enriched due to the known Cooling System Defect in the Defective Vehicles through money paid that earned interest or otherwise added to Porsche's profits when it should have remained with Plaintiffs and the other Class Members.

134.  As a result of Porsche's unjust enrichment, Plaintiffs and the other Class Members have suffered damages.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class Members, respectfully request that the Court enter an Order:

a.   certifying the Class under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as requested herein;

b.   appointing Plaintiffs as Class Representatives and the undersigned counsel as Class Counsel;

c.   finding that Porsche engaged in the unlawful conduct as alleged herein;

d.   awarding Plaintiffs and the other Class Members damages;

e.   awarding Plaintiffs and the other Class Members restitution and disgorgement of monies Porsche acquired through its violations of the law;

f.   awarding Plaintiffs and the other Class Members declaratory and injunctive relief, including requiring Porsche to repair or replace the Defective Vehicles' engine cooling system components and inform purchasers and leasees of the defect;

g.   awarding Plaintiffs and the other Class Members pre-judgment and post-judgment interest on all amounts awarded;

h.   awarding Plaintiffs and the other Class Members reasonable attorneys' fees, costs, and expenses; and

i.   granting such other relief as the Court deems just and appropriate.

00160001

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims in this Class Action Complaint so triable.

Respectfully submitted,

Dated: February 3, 2020

*s/David J. Worley*

DAVID J. WORLEY

David J. Worley
**EVANGELISTA WORLEY LLC**
500 Sugar Mill Road, Bldg. A Suite 245
Atlanta, Georgia 30350
Tel: (404) 600-0492
david@ewlawllc.com

Timothy G. Blood (*pro hac vice to be filed*)
Paula R. Brown (*pro hac vice to be filed*)
Aleksandr J. Yarmolinets (CA 276707)
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, California 92101
Tel: (619) 338-1100
Fax: (619) 338-1101
*tblood@bholaw.com*
*pbrown@bholaw.com*
*ayarmolinets@bholaw.com*

Ray P. Boucher (*pro hac vice to be filed*)
Maria L. Weitz (*pro hac vice to be filed*)
**BOUCHER LLP**
26100 Oxnard Street, Suite 600
Woodland Hills, California 91367
Tel: (818) 340-5400
Fax: (818) 340-5401
*ray@boucher.la*
*weitz@boucher.la*

*Attorneys for Plaintiffs*

53

00160001