

## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION
 3
 4   * * * * * * * * * * * * * * *
     MICHAEL XU and DANIEL        *
 5   VAZ-POCAS, individually and  *
     on behalf of all others      *
 6   similarly situated,          *
             Plaintiffs,          *
 7                                * Civil Action No.
     V.                           *
 8                                * 1:20-cv-00510-AT
     PORSCHE CARS NORTH AMERICA,  *
 9   INC., a Delaware corporation,*
             Defendants.          *
10   * * * * * * * * * * * * * * *
                                       July 14, 2021
11                                       10:01 a.m.
                       — — —
12
            REMOTE DEPOSITION OF DANIEL VAZ-POCAS
13                     — — —
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1   APPEARANCES:
 2
 3      FOR THE PLAINTIFFS:
 4           BLOOD HURST & O'REARDON, LLP
             (APPEARING VIA ZOOM)
 5        BY: PAULA R. BROWN, ESQUIRE
             JAMES M. DAVIS, ESQUIRE
 6           501 West Broadway, Suite 1490
             San Diego, California 92101
 7           Phone: (619) 338-1100
             Email: pbrown@bholaw.com
 8                  jdavis@bholaw.com
 9      FOR THE DEFENDANT:
10           DLA PIPER LLP
             (APPEARING VIA ZOOM)
11        BY: MATTHEW A. GOLDBERG, ESQUIRE
             TIMOTHY PFENNINGER, ESQUIRE
12           1650 Market Street, Suite 5000
             Philadelphia, Pennsylvania 19103
13           Phone: (215) 656-3300
             Email: matthew.goldberg@dlapiper.com
14                  timothy.pfenninger@dlapiper.com
15           LEE HONG DEGERMAN KANG & WAIMEY
             (APPEARING VIA ZOOM)
16        BY: ANIKA P. BRUNSON, ESQUIRE
             3501 Jamboree Road, Suite 6000
17           Newport Beach, California 92660
             Phone: (949) 250-9954
18           Email:  anika.brunson@lhlaw.com
19
20
21
22
23
24
25
```

## Page 3

```
 1                    I N D E X
 2
                                                    PAGE
 3
     DANIEL VAZ-POCAS
 4
 5        Examination by Mr. Goldberg              11
 6
 7
 8   EXHIBITS
 9
10
11   NUMBER          DESCRIPTION                    ID
12   Exhibit No. 1   Sales Agreement                 7
13   Exhibit No. 2   Sales Agreement                 7
14   Exhibit No. 3   Sales Agreement                 7
15   Exhibit No. 4   Complaint                       7
16   Exhibit No. 5   CARFAX Report                   7
17   Exhibit No. 6   2012 Porsche Cayenne S
                     E2 I Vehicle Information        7
18
19   Exhibit No. 7   Repair Orders                   7
20   Exhibit No. 8   Check                           7
21   Exhibit No. 9   Email - January 24, 2017        7
22   Exhibit No. 10  Emails - January 2017
                     to February 2017                7
23
24   Exhibit No. 11  Multipoint Inspection
                     Records                         7
25
```

## Page 4

```
 1   NUMBER          DESCRIPTION                    ID
 2   Exhibit No. 12  Email chain - January 27,
                     2017 to January 31, 2017        8
 3
 4   Exhibit No. 13  Email - April 23, 2021          8
 5   Exhibit No. 14  Email chain - February 2021
                     to March 2021                   8
 6
 7   Exhibit No. 15  Email chain May 2017            8
 8   Exhibit No. 16  Email chain May 2017            8
 9   Exhibit No. 17  Service Record                  8
10   Exhibit No. 18  Email May 22, 2017              8
11   Exhibit No. 19  Email June 13, 2017             8
12   Exhibit No. 20  Safelite Auto Glass
                     Receipt                         8
13
14   Exhibit No. 21  Safelite Auto Glass
                     Invoice                         8
15
16   Exhibit No. 22  Almeida's Auto Body
                     Preliminary Estimate            8
17
18   Exhibit No. 23  MTech Motors, Inc.
                     Invoice                         9
19
20   Exhibit No. 24  Sambucci Brothers Long
                     Island Quote                    9
21
         Exhibit No. 25  Plaintiff Daniel Vaz-Pocas'
22                   Responses and Objections to
                     Defendant's First Set of
23                   Interrogatories                 9
24
25
```



Page 41

1 specifically, or were you -- was it more of a broader
2 search to get information on Porsche vehicles?
3  A.  It started out broader.
4  Q.  Okay. And this research, were you specifically
5 researching the 2012 model year Cayenne S or other model
6 years?
7  A.  Other model years. It was that line, the 958.
8  Q.  Okay. And did you do any specific research,
9 before buying the vehicle, on the 2012 model year
10 Cayenne S?
11  A.  Yes.
12  Q.  Okay. And tell me what that entailed.
13  A.  So the same thing. I would dig a bit deeper
14 into some of the publications like MotorTrend and Car and
15 Driver on the specific 2012 after I found it. As well as
16 searching through forums, just on overall reliability,
17 performance, people's sentiment on the vehicle, and so
18 forth.
19  Q.  And how did that research impact your decision
20 to ultimately buy the 2012 Cayenne?
21  A.  It supported it.
22  Q.  And you went -- you said you went to the forums
23 as well. Do you recall what forums you visited about the
24 2012 Cayenne S?
25  A.  I believe it was Rennlist and 6speed.

Page 42

1  Q.  Did you do any search into problems Cayenne
2 owners were reporting online about their vehicles?
3  A.  Yes.
4  Q.  And I'm talking about the time period before you
5 bought it.
6  A.  Yes.
7  Q.  Tell me about what you saw and what you learned.
8  A.  It was overwhelmingly focused on the transfer
9 case. From what I understand, the transfer case has a --
10 what's considered to be a design flaw, at least in the
11 public world, where moisture can find its way into the
12 transfer case and degrade the internal gears or degrade
13 the fluid that protects the gears. And with time, that
14 transfer case could fail, which is a catastrophic, or
15 very expensive failure, I'll call it.
16  Q.  Okay. And how did learning about that issue
17 impact your decision to ultimately purchase the 2012
18 Cayenne S?
19  A.  It concerned me, to some extent.
20  Q.  Okay. And so what did you do about that?
21  A.  I decided to buy directly from a Porsche
22 dealership, and I stayed away from used car dealerships.
23 Because I felt that a Porsche dealership could inspect
24 and verify and ensure that it's not an issue or that it's
25 not an imminent failure.

Page 43

1  Q.  Did you research any other problems that Cayenne
2 owners are reporting online about their vehicles before
3 you purchased your car?
4  A.  That's all I really found was the transfer case.
5  Q.  Okay.
6   MR. GOLDBERG: Tim, let's pull up the complaint.
7
8 BY MR. GOLDBERG:
9  Q.  Sir, we're going to show you a portion of the
10 complaint in this case. And we're going to direct you to
11 a specific paragraph, but if you want to review the whole
12 document or other parts of it, just, you know, feel free
13 to do that.
14   I'll direct you particularly to Paragraph 41,
15 where there are a bunch of complaints cited about the
16 Cayenne. And my question is whether you had seen any of
17 these complaints prior to buying your vehicle.
18  A.  Okay. I'm pulling it up now. No, I had not
19 seen any of these in Paragraph 41.
20  Q.  Okay. Okay. Let's talk about the first time
21 that you went to Town Motors. Did you just show up at
22 the dealership, or did you call beforehand and make an
23 appointment?
24  A.  I called to make an appointment.
25  Q.  Okay. And do you recall when you made that

Page 44

1 call?
2  A.  I believe it was probably late December -- it
3 may have been very early January 2017. It was right
4 around the New Year.
5  Q.  Okay. And at the time you were making the
6 appointment, did you express interest in a particular
7 vehicle that Town Motors had on the lot?
8  A.  Yes.
9  Q.  Okay. And which vehicle was that?
10  A.  The one I purchased.
11  Q.  Okay. When was the first time you visited Town
12 Motors in person?
13  A.  It was probably early to mid January.
14  Q.  Okay. And when you first visited the
15 dealership, did you go by yourself?
16  A.  Yes.
17  Q.  Okay. And tell me about what happened during
18 that first visit. What did you do?
19  A.  Sure. So I went to see the vehicle. Online
20 they had no pictures because the car had apparently just
21 been traded in. So I wanted to see it firsthand and see
22 if it was something I'd be interested in, since it was --
23 since I wasn't able to see it online. So I went in. The
24 car was on the lift. The mechanic was looking at it, and
25 the representative who I met with took me into the



Page 53

1  Q. Okay. And what were your impressions having
2  reviewed those documents? Your impressions of the
3  vehicle. I'm sorry.
4    A. Impressions of the vehicle?
5    Q. Yes.
6    A. Impressed. I loved it. I think it was, as I
7  said, smooth. Really great vehicle, very comfortable.
8  Felt safe, felt secure. All-wheel drive was something
9  that was new to me but felt very -- very
10 confidence-inducing in terms of, you know, stability.
11 Definitely did not feel like an SUV. It felt like
12 something that was well planted and very premium. The
13 interior design was beautiful. Everything was great
14 materials, and I think it lived up to what I would have
15 expected from Porsche, which is, you know, pinnacle of
16 design, pinnacle of engineering, and pinnacle of
17 performance.
18   Q. Other than the repair inspection records that
19 you were provided that day, did the dealership give you
20 any other documentation about the vehicle?
21   A. Yes.
22   Q. And what was that?
23   A. The brochure.
24   Q. Can you be more specific? What brochure did you
25 receive?

Page 54

1    A. So the 958 Cayenne advertising brochure.
2    Q. And did that brochure cover a specific model
3  year Cayenne?
4    A. I couldn't say.
5    Q. Do you still have that brochure?
6    A. I am unsure. I would have to check my files.
7    Q. So at the time you're looking at the Cayenne,
8  what vehicle were you driving?
9    A. A BMW 335i, 2008.
10   Q. And was that your only vehicle at that time?
11   A. No. I had a second.
12   Q. Okay. And what was that?
13   A. A '94 Honda Accord.
14   Q. So was the plan to -- if you got the Cayenne, to
15 get rid of one of those vehicles? Or were you going
16 to -- was your plan to hang on to all three of them?
17   A. No. Certainly get rid of -- and I'm trying to
18 recall if the Honda was sold before or after I bought the
19 Cayenne. I believe -- I believe the Honda Accord was
20 sold; I purchased the Cayenne. So at that time -- I
21 retract my statement. I only had the one vehicle, the
22 BMW.
23   Q. Okay. Got it.
24   A. To answer your question, the intention was to
25 sell that vehicle.

Page 55

1    Q. To sell the BMW?
2    A. No -- to sell the BMW, so I would only have the
3  one vehicle.
4    Q. And did you have any discussions with Town
5  Motors about trading in the BMW as part of your efforts
6  to acquire the Cayenne?
7    A. I believe they asked me, but I had no intention
8  of trading it in.
9    Q. Your preference was to try to sell the vehicle
10 privately?
11   A. Yes.
12   Q. Okay. And did you end up selling the BMW?
13   A. Yes.
14   Q. Okay. Besides the brochure and repair
15 inspection records, did Town Motors give you any other
16 documents about the vehicle on that visit?
17   A. Yes. There was the window sticker that had the
18 full feature list for that particular VIN.
19   Q. Okay. Anything else?
20   A. I don't believe so.
21   Q. I know I'm testing your memory here, but tell me
22 about what happened after the second visit. At that
23 point, had you made any decisions about the car, or did
24 you make an appointment to see it for a third time? Just
25 kind of walk me through, kind of, next steps.

Page 56

1    A. Well, that's where I'm struggling, because I
2  don't recall -- I know when my father and my wife were
3  with me, that's when I made the purchase. I don't recall
4  if that was the second visit or the third. And so on
5  that last visit where I purchased -- when I purchased the
6  vehicle, if that's the one you're interested in -- can we
7  assume that?
8    Q. I just wanted to know if you can remember if
9  there was a third visit or not. And I think your answer
10 is you're not sure; is that right?
11   A. I'm not sure. I know I went once by myself to
12 take a look at the vehicle while it was on the lift. I
13 know I went once with my father and my wife, and I made
14 the purchase that day. I don't recall if -- I believe I
15 test drove the vehicle that day. I don't recall if there
16 was a visit in the middle where I test drove.
17   Q. Okay. So did you -- is it fair to say you
18 purchased the vehicle on the day that you test drove it?
19   A. Yes.
20   Q. Okay. And do you remember what the vehicle
21 was -- what the list price was from the dealer on the
22 Cayenne?
23   A. Brand new, MSRP?
24   Q. No, the used vehicle price.
25   A. Oh. It was in the -- I believe it was around



Page 57

1  41.  I think it was in the low 40s, 41,000.  I believe.
2    Q.  Okay.  And then you engaged in some negotiations
3  with the dealer as to the price; correct?
4    A.  Correct.
5    Q.  Tell me about that.  Tell me about what you
6  discussed.
7    A.  Sure.  I told him that I was comfortable
8  spending 40,000; that was my budget out of pocket.  And
9  so I offered 40,000, and he stepped away to speak with
10  his manager.
11   Q.  And what did he come back with?
12   A.  So he came back, and they spoke and said, well,
13  "We're very close.  I think we can make it work."  And it
14  was actually fairly simple.  After they stepped away, I
15  spoke with my father and my wife, just to get their
16  opinion.  And we decided to move forward.
17   Q.  All right.
18       MR. GOLDBERG:  We've been going for little bit
19  more than an hour.  How are you feeling?  Would you like
20  to take a short break to use the restroom, get a drink?
21  Keep going?
22       THE DEPONENT:  I'm okay for the next 20 minutes
23  if everyone else is.
24       MR. GOLDBERG:  Okay.  Okay.  Anybody else need a
25  break?  Okay.  All right.  Can we pull the sales

Page 58

1  agreement back up.
2  BY MR. GOLDBERG:
3    Q.  So we're going to go back to the sales
4  agreements again here.
5       MR. GOLDBERG:  Can you pull up 33, Bates 33.
6  Okay.  You can hold it right there.
7
8  BY MR. GOLDBERG:
9    Q.  Sir, is it fair to say that as part of your
10  negotiations for the price that --
11   A.  I'm sorry.  I'm not seeing a document.
12   Q.  I apologize.  Okay.  It will be Vaz-Pocas 33.
13      MS. BROWN:  Document 2.
14      THE DEPONENT:  Document 2.  Okay.  Thank you.
15  BY MR. GOLDBERG:
16   Q.  And so if you go up to the first page of that
17  document, on the left-hand side there's a column that
18  says, "Package equipment."  And then there's a whole bunch
19  of N/As.
20   A.  Mm-hmm.
21   Q.  And then to me it says you gave a $2,500 deposit
22  and the "Dealer agrees to paint the front and rear
23  bumper, paint rear deck lid, and replace rear tires."  Is
24  that -- am I reading that correctly?
25   A.  Yes.

Page 59

1    Q.  And are those the items that the dealer agreed
2  to fix on the vehicle as part of your purchase?
3    A.  Yes.
4    Q.  Did the dealer agree to fix anything else on the
5  vehicle at that time that's not reflected here?
6    A.  Nothing is -- nothing specifically.
7    Q.  Okay.
8    A.  But he did -- I remember the representative did
9  tell me if I find anything else, if there's any other
10  issues, to let them know and they would take care of it,
11  which they did.
12   Q.  Okay.  So during the time when you were visiting
13  the vehicle -- sorry, strike that -- visiting the
14  dealership and making a decision on whether to purchase
15  the vehicle, did you have any conversations with anyone
16  at the dealership about what work they had done on the
17  vehicle and what had been repaired?
18   A.  Just the representative that I worked with,
19  William.
20   Q.  And I'm reading from -- you gave your
21  interrogatory answers in this case.  And I don't think I
22  need to pull them up on the screen, unless you want to
23  see them.  But in your answer to Interrogatory No. 2, you
24  said that, "Plaintiff also considered the information
25  about the vehicle provided by Town Motors Porsche at the

Page 60

1  time of sale, including confirmation that a full
2  multipoint inspection was performed on the vehicle and
3  all issues with the vehicle were addressed by Town Motors
4  Porsche before the sale was completed."
5       Okay.  Did Town Motors represent to you that
6  they had performed a full multipoint inspection on the
7  vehicle prior to when you bought it?
8    A.  Yes.
9    Q.  Okay.  And what does a multipoint inspection
10  mean to you?  What is that?
11   A.  I think it's different for each brand or each
12  manufacturer.  But to me it means that that brand went
13  through the full inspection of all systems that they deem
14  to be critical to the vehicle to ensure that it operates
15  to standards, it operates safely, and it meets all of the
16  brand's reputation requirements or standards.
17   Q.  Okay.  And when you say "all issues with the
18  vehicle were addressed by Town Motors Porsche before the
19  sale was completed," did you have any discussions with
20  Town Motors about what those issues were that were
21  addressed?
22   A.  Yes.
23   Q.  Okay.  And would you describe those for me?
24   A.  Sure.  So that's when he provided the document
25  that showed all of the repairs, and he introduced me to



Page 61
1 the mechanic. But we didn't have, I'd say, a fruitful
2 conversation since he was working. He just introduced me
3 and showed me the list of some of the things that were
4 repaired. I don't recall offhand all of the items that
5 were shown to me, but I did see that the transfer case
6 module was repaired, which was my biggest concern at the
7 time. I believe that were O-rings and gaskets and some
8 small parts here and there that were replaced as well.
9   Q. Is it fair to say that based on what you were
10 told by the dealership and the mechanic, that you were
11 comfortable buying the vehicle at that point?
12   A. Yes.
13   Q. Okay. Prior to when you purchased the Cayenne,
14 did you do any research on the website of the National
15 Highway Traffic Safety Administration about the 2012
16 Cayenne S?
17   A. No.
18   Q. Other than the brochure that was given to you by
19 Town Motors, did you review any other marketing brochures
20 about the Porsche Cayenne before you bought the vehicle?
21   A. Yes.
22   Q. Okay. And where did you acquire those?
23   A. On the via Internet via Google.
24   Q. And what did you learn about the vehicle from
25 reviewing those brochures, or what made an impression on

Page 62
1 you?
2   A. So certainly the fact that it's a Porsche but a
3 family car, you know, a family version of the Porsche.
4 It seemed like it was a car that is capable of even going
5 off-road. It has differential settings that can be
6 locked in and out. So it seemed like it was a true SUV,
7 a sport utility vehicle, that can cover different levels
8 of traction and performance. And, ultimately, that it
9 was a safe, reliable, all-wheel-drive car from a very
10 reputable brand.
11   Q. And before you bought the vehicle, did you have
12 any conversations with other Porsche owners about their
13 experience with Porsche vehicles?
14   A. Yes.
15   Q. Okay. And who was that?
16   A. My godfather.
17   Q. Okay. And tell me about that conversation.
18   A. So he had purchased -- sometime before that,
19 maybe a year before that, he had purchased a used 911
20 Turbo. And he just told me that he was absolutely in
21 love with it. It drives like no other car he's ever
22 driven before. That he was a firm believer in Porsche
23 now, which that was his first Porsche. And it was
24 something that he was really passionate about and really
25 loved and said it was a great car.

Page 63
1   Q. Okay. And that conversation occurred prior to
2 when you bought the Cayenne?
3   A. Yes.
4   Q. All right. Did you speak with any other Porsche
5 owners before you bought the vehicle?
6   A. No.
7   Q. Okay. Other than the sales representative we've
8 already talked about, I think you said his first name was
9 William, and the mechanic, did you speak with anybody
10 else at Town Motors while you were in the process of
11 looking at the Cayenne and deciding to acquire it?
12   A. Pre-purchase, no one other than them two and
13 William's manager at the time of sale.
14   Q. Do you remember who William's manager was?
15   A. I can't recall his name. Scott rings a bell,
16 but I couldn't say with confidence.
17   Q. All right. And before you had told me that on
18 one of your visits to Town Motors, you were given the
19 window sticker from the Cayenne?
20   A. Yes.
21   Q. Okay. And is that something that you produced
22 in this case?
23   A. Yes.
24   Q. Okay.
25   A. It was a feature list. I'm not sure if it's

Page 64
1 necessarily a window sticker, but that's what they had to
2 provide me with.
3   Q. Are you familiar with the term Monroney label?
4   A. No.
5   Q. Do you recall when you visited Town Motors
6 whether there was a used car buyer's guard -- sorry,
7 strike that -- a used car buyer's guide posted on the
8 window of the Cayenne?
9   A. No.
10   Q. Did you have any conversations with Town Motors
11 about warranty coverage for the Cayenne?
12   A. Yes.
13   Q. Okay. Tell me about that conversation.
14   A. Sure. So per New Jersey state law, I was
15 informed that there was a minimum of 30-day express
16 warranty for any used car dealership that's mandated.
17 And then buying it from the Porsche dealership, they
18 assured me that if there were any issues, just give them
19 a call, they would take care of it. That the car was
20 fully inspected and that they would stand behind it.
21   Q. Did Town Motors offer to sell you any type of
22 extended warranty coverage for the vehicle?
23   A. Yes.
24   Q. Okay. And tell me about that conversation.
25   A. Sure. So that was at the time of sale. I met



Page 65

1  with their finance manager.  And, I'm sorry, I don't
2  recall his name either.  It was just a brief
3  conversation, where we went through the financials for
4  the purchase as well as the option of the extended
5  warranty.  They offered the warranty.  I believe it was a
6  one-year option or a two-year option, depending on which
7  plan I wanted.  And so I reviewed the documents at that
8  time.
9     Q.  Okay.  And did you buy any additional coverage
10  for the vehicle?
11     A.  No.
12     Q.  Okay.  And why not?
13     A.  The cost was exorbitant, and it was only for, I
14  believe, either one year or two years.  The cost, if I
15  recall correctly, was about $5,000 or $6,000.  My main
16  concern at that time was the transfer case, since that
17  was the only issue that I knew was prevalent on the
18  vehicle.  And in the event that the transfer case failed,
19  a repair was roughly $5,000.  And so I just -- I didn't
20  think that the cost for one-year protection was worth it,
21  especially since I was buying it from a Porsche
22  dealership who had performed a multipoint inspection and
23  had assured me that the car was up to standard.
24     Q.  Other than buying extended warranty protection
25  from Town Motors, did you do any research on purchasing

Page 66

1  extended warranty coverage from any other source?
2     A.  No.
3     Q.  Okay.  So you had told me that the dealership
4  told you that under New Jersey law, there was a 30-day
5  warranty period that attached to your vehicle at the time
6  that you purchased it --
7     A.  Yes.
8     Q.  -- is that correct?
9     A.  Correct.
10     Q.  In your understanding, after that 30 days
11  lapsed, who was responsible for paying for any repairs to
12  your Cayenne?
13     A.  Myself.
14     Q.  All right.
15        MR. GOLDBERG:  So we're going to -- we're going
16  to look at some more documents now.  Before I dive into
17  that, is this -- would you like to take your break now?
18        THE DEPONENT:  Sure.  That would be great.
19  Thank you.
20        MR. GOLDBERG:  Okay.  We'll take a few minutes
21  and then come back.  Okay?
22        THE DEPONENT:  Like, eight minutes?  Is that
23  okay?
24        MR. GOLDBERG:  Yeah, 11:40.  That's great.
25        THE DEPONENT:  Okay.  Thank you.

Page 67

1        (The proceedings went off the record, and there
2  was a recess taken at 11:32 a.m.)
3        (The proceedings went back on the record, and
4  the deposition was resumed at 11:40 a.m.)
5  BY MR. GOLDBERG:
6     Q.  Okay.  So we're going to show you -- we're going
7  to go through some of the documents, sir, that you
8  produced in this case.  And we're going to start with a
9  CARFAX report.  And Tim is just marking that.  And I
10  don't have a ton of questions about this document.  But
11  why don't you, you know, take the time you need to look
12  at it.
13     A.  Okay.
14     Q.  Okay.  Sir, was this CARFAX report given to you
15  by Town Motors before you bought the Cayenne?
16     A.  Yes.
17     Q.  And was that during the same visit that you were
18  provided the repair inspection documents and what we
19  called the window sticker?
20     A.  Yes.
21     Q.  Okay.  And did you review this CARFAX report
22  before deciding to buy the vehicle?
23     A.  Yes.
24     Q.  Do you recall having any concerns about the
25  vehicle based on what you read on the CARFAX report?

Page 68

1     A.  No major concerns, no.
2     Q.  Okay.  If you look at the second page of the
3  CARFAX report, which is Vaz-Pocas 17, under "Detailed
4  History."  About halfway under that, November 16, 2012,
5  there is a report of an "Accident reported involving rear
6  impact with another motor vehicle.  Rear area primarily
7  damaged.  Vehicle drivable."
8        Do you recall seeing that specific entry prior
9  to buying the Cayenne?
10     A.  Yes.
11     Q.  Okay.  And did that cause you any concern about
12  buying the vehicle?
13     A.  Yes.
14     Q.  Okay.  And did you speak to Town Motors about
15  that concern?
16     A.  I did.
17     Q.  Okay.  And what were you told?
18     A.  They didn't have any detailed information.  But
19  I remember they had told me that it was probably a minor
20  fender bender.  They didn't see any type of structural
21  damage.  The vehicle was brand new at that time, and
22  that, at this point, I guess, it was five years old.  And
23  no issues had come up in the five years since that
24  accident, or maybe four and a half years since that
25  accident.  So they had told me that it was likely just a

